CASE NO.: _____

**JOSEPH LANIGAN**,

      Plaintiff,

v.

**RED GINGER SB, LLC,** a
Florida limited liability company, and
**GROOT PS MANAGEMENT LLC**,
a Florida limited liability company,

      Defendants.

_____ /

## COMPLAINT

Plaintiff, JOSEPH LANIGAN ("Lanigan" or "Plaintiff"), through his counsel, files his Complaint against Defendants, RED GINGER SB, LLC, an active Florida limited liability company ("Red Ginger") and GROOT PS MANAGEMENT LLC ("Groot") (Red Ginger and Groot are collectively referred to herein as "Defendants").

## PARTIES, JURISDICTION, VENUE & CONDITIONS PRECEDENT

1. This is an action for damages by Plaintiff against Defendants arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq*. (1964) ("Title VII"), and the Florida Civil Rights Act, Fla. Stat. § 760.01 *et seq*. (the "FCRA").

2. Lanigan is an individual who is over the age of eighteen (18), is *sui juris* and is a resident of Miami-Dade County, Florida.

3. Defendant, Red Ginger is an active Florida limited liability company whose principal place of business is in Miami-Dade County, Florida.

4. Defendant, Groot is an active Florida limited liability company whose principal

place of business is in Miami-Dade County, Florida.

5. Upon information and belief, at all material times Lanigan was employed by both Defendants as joint employers in Miami-Dade County, Florida.

6. This Court has personal jurisdiction over the Defendants because they engage in continuous and systematic business contacts within the State of Florida and maintain a substantial physical presence in the State of Florida, including the operation of their corporate headquarters in Miami-Dade County, Florida.

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(4), as this is an action brought pursuant to Title VII.

8. The Court has supplemental jurisdiction over Plaintiff's claims under the FCRA, as these claims arise out of the same common nucleus of operative facts as Plaintiff's Title VII claims, and together, form part of the same case or controversy.

9. Venue is proper in the Southern District of Florida, in this division, because a substantial part of the events (including discriminatory practices) giving rise to Plaintiff's claims occurred within this District and Division.

10. Venue is further proper in this District because the Defendants are subject to personal jurisdiction herein by virtue of their substantial, continuous, and systematic commercial activities in this District. *See* 28 U.S.C. § 1391(b), (c). Defendants are subject to personal jurisdiction in this Division and therefore "reside" in this Division for venue purposes. *See* 28 U.S.C. § 1391(c)).

11. All conditions precedent to the filing of this lawsuit have occurred, have been waived or have been performed, including but not limited to Plaintiff exhausting his administrative

remedies by complying with the statutory prerequisites of dual-filing a timely charge of discrimination against the Defendants with the United States Equal Employment Opportunity Commission ("EEOC") and the Florida Commission on Human Relations ("FCHR").

12. Specifically, on November 13, 2023, Lanigan dual filed his Charge of Discrimination with the EEOC and the FCHR .

13. On June 27, 2024, the EEOC issued Lanigan his Dismissal and Notice of Rights ("Right to Sue"). A copy of the Right to Sue is attached as **Exhibit A**.

14. This lawsuit is timely filed within ninety (90) days of Lanigan's receipt of the Right to Sue.

15. Further, more than One Hundred and Eighty (180) days have passed since the filing of Lanigan's dual-filed Charge of Discrimination.

16. The FCHR did not issue any determination concerning Lanigan's Charge.

17. As a result, pursuant to F.S. §760.11(18), which provides that if the FCHR fails to conciliate or determine whether there is reasonable cause on any complaint under that section within 180 days of the filing of the complaint, an aggrieved person may file a civil action "as if the commission determined that there was reasonable cause."

18. Therefore, Lanigan exhausted all administrative remedies under Federal and Florida law.

## FACTUAL ALLEGATIONS

19. At all times material to this Complaint, Groot was an entity that owned restaurants, including Papi Steak.

20.     At all times material to this Complaint, Red Ginger was an entity that operated Papi Steak.

21.     Lanigan worked for Groot since October 2016, at three different restaurants as follows: at Komodo as a server from October 23, 2016, to November 17, 2018; at Swan as a manager from November 18, 2018, to September 15, 2023; and at Papi Steak as a server from September 16, 2019, until his termination on August 2, 2023.

22.     While working at Papi Steak, Lanigan was also employed by Red Ginger.

23.     Lanigan worked as a server and as a manager for several years without any lapse in employment and without any issues until he started working at Papi Steak.

24.     During Lanigan's employment at Papi Steak with Defendants, he was sexually harassed and retaliated against.

**January 2023 – April 2023**

25.     On January 22, 2023, at approximately 7:30 p.m., Lanigan was working his shift at Papi Steak, when, in front of all his colleagues in the dining room, then-manager Anthony Dreyer ("Dreyer") grabbed Lanigan's genitals and said: "Oh it's tiny today." Upon information and belief, this event was captured by the cameras at Papi Steak.

26.     Lanigan immediately confronted Dreyer, but Dreyer told Lanigan that if he had a problem he should speak to the restaurant General Manager Andre Marques ("Marques").

27.     On January 28, 2023, Lanigan had the opportunity to discuss the matter with two managers, Marques and Laurence Turnier ("Turnier").

28.     Lanigan told them how Dreyer spoke sexually inappropriately to other colleagues and himself, and he complained about Dreyer grabbing his genitals in front of the other servers, and he urged them to look at the camera system footage.

29.     Marques told Lanigan he was aware of Dreyer grabbing other guys as well, and that he would talk to him and get back to him.

30.     Since Lanigan complained about Dreyer's behavior, Dreyer and other managers were checking Lanigan's overall job, schedule, and performance, following him everywhere in the restaurant, looking for errors at his tables, asking coworkers for water bottle counts to find errors in his tables checks after the clients had left, waiting for the opportunity to take disciplinary action against Lanigan.

31.     Dreyer got defensive with Lanigan and told him that he really knew what bullying is.

32.     The music was loud, so Lanigan did not get the whole sentence from him, but he was hostile and other managers saw his behavior.

33.     Since the January 28, 2023, conversation with General Manager Marques, there was no communication with Lanigan regarding Dreyer's behavior, until April 19, 2023.

34.     On April 19, 2023, Lanigan attended a meeting with then-Human Resources Manager, Rachel Puron ("Puron") and Marques at Groot's corporate headquarters.

35.     On April 26, 2023, Puron emailed Lanigan letting him know that HR was closing the investigation. The email stated as follows:

> *Per the conversation Andre Marques and I had with you on 04/19/23, I wanted to summarize your concerns into the allegation brought forth against Anthony Dreyer. Per your allegations, Anthony acted inappropriately and/or violated company policy by continuously tapping/pitching/grabbing your genitals for an unknown*

*period of time since you have worked together at Papi Steak. Sometime in January 2023 you approached Andre to explain this was happening to you with Anthony, for which he told you he was going to address it. As it was concluded during our conversation, Anthony's behavior mentioned above stop immediately following that conversation. However, you claimed that although the initial behavior stopped, Anthony started to exhibit other forms of inappropriate behaviors towards you such as, verbally offensive comments with a sexual connotation and trying to look for any potential mistakes you could have made on the job not in an intrinsic way from February to March of 2023 to get you in trouble. Ultimately, you decided to send an email to Andre (GM) on 04/4/23 claiming you were still feeling uncomfortable with your interactions with Anthony and that HR did not contact you to resolve it. However, we also stablished during our conversation that the first incident was indeed resolved because the behavior exhibited stopped after Andre said he was going to address it with Anthony, and that we were focusing on the second allegation. Also, it was not until you wrote said email that HR got aware, since you have never talked to or contacted HR directly to investigate this matter. Lastly, you claimed that after your first conversation with Andre (GM) back in January 2023, the FOH management team had you on a blacklist to terminate you and purposely give you extra pressure while at work.*

*As we discussed, the Company takes such allegations very seriously and does not tolerate inappropriate behavior in the workplace. We always encourage employees to bring matters to our attention at any time, without fear of any adverse action being taken against them for doing so. To ensure a consistent, fair, and detailed outcome, I have interviewed all involved parties, including you, witnesses, and Anthony, and they have provided me with their written statements. However, during our conversation you were asked to provide me with witnesses' names that can support your claims and your written statement by 04/23/23 but have failed to do so to this date.*

*Therefore, the investigation has concluded with the supporting documentation at hand and I would like to present it to you in-person tomorrow, 04/26/23 at Papi Steak at 5PM.*

36. Since the reporting of the incidents to Marques and Puron, Lanigan was retaliated against.

37. The Assistant Manager, Davide Impresio ("Impresio"), and General Manager, Marques, who prepare Lanigan's schedule and all front house employees, (bussers, servers, assistant servers and bartenders) drastically reduced Lanigan's shifts to less lucrative and/or less

busy hours in the restaurant despite Lanigan's job experience working for the restaurants for more than seven (7) years.

38. During all these years working for Defendants, Lanigan worked weekends which are the most lucrative shifts.

39. After his complaint, Lanigan's shifts were switched from working weekends to only working on Sundays, Mondays, Tuesdays, and Wednesdays.

40. Also, Lanigan was denied the ability to swap shifts with other coworkers to cover for shifts in case of vacations, days off, or emergencies, something which did not occur prior to his complaint.

41. Lanigan made requests to work other days during the week, and these requests were denied.

42. Specifically, Lanigan had several conversations with Marques and Impresio wherein they denied Lanigan's requests to work for Friday and Saturday nights, stating "you are not part of the A-Team" as reasoning.

43. Additionally, Impresio told Lanigan that he could lose his health insurance if he wasn't working full time.

44. Also, four coworkers Jodney Chavanne, Alexis Orozco, Nicole Klobedanz and Allison Christani reached out to Lanigan and told him that management openly spoke to them about Lanigan being on a list of employees that all managers and David Einhorn (Papi) were planning to fire, and they were monitoring Lanigan closely and would write up for any mistake until Lanigan is in a position where he can't win. Lanigan informed Impresio he was aware of this.

45. On another occasion, after Lanigan had complained about Dreyer, Lanigan was assigned to a VIP table which consisted of the Beckham family and Groots' owner, David Grutman.

46. Dreyer was assigned to the same table to assist with the wine service. Dreyer told Lanigan: "I will be so close behind you in this service, you will feel the tip of my dick."

47. Despite the numerous emails and meetings with Human Resources and General Manager Marques, the retaliation-type situations for reporting sexual harassment were an everyday act against Lanigan at every shift he works.

48. Moreover, despite Dreyer's behavior toward Lanigan, which was based on Lanigan's sex, Defendants took no action against Dreyer, allowing a predator to continue his harassment.

49. The Defendants' investigation into Lanigan's complaint was perfunctory at best.

50. Lanigan was never provided a copy of any investigative final report, copies of the supposed "witness statements."

51. In short, the Defendants did nothing to protect Lanigan from Dreyer.

**May 2023 – August 2023**

52. Thereafter, in May 2023, Lanigan was issued a "Final Warning" allegedly stemming from a bad review/overcooked steak.

53. Additionally, Lanigan's schedule remained the same with every request to work weekends and denied. Support staff would openly request to management to work with servers other than Lanigan because it was known that management would not sit VIP or high spending customers in Lanigan's section.

8

54. All of this was in retaliation for Lanigan's above-referenced complaints.

55. Despite the above-referenced complaints, the hostile work environment, sexual harassment and retaliation (referenced above) continued.

56. On June 21, 2023, while Lanigan was working on the computer, Dreyer walked up behind Lanigan, put his lips to his neck and breathed hot air, heavily against the back of his neck, and in front on the main camera (approx. 11:15pm) by entrance to the kitchen, and then quickly walked away.

57. On June 23, 2023, Dreyer grabbed Adrian Rodriguez's ("Adrian") genitals during service and caused Adrian to rage in response.

58. Adrian informed Marques and Imperioso of the incident during a heated debate with Dreyer with all of the front of the house staff present.

59. Additionally, Dreyer has grabbed the genitals of two other colleagues, Daniel Gonzalez and Sean Dougherty, each of whom made complaints to Marques.

60. In July 2023, Lanigan notified Puron about the continued hostile work environment, harassment, and retaliation, requesting a transfer.

61. On July 19, 2023, Lanigan had an in-person meeting with Puron, again informing her of the specifics of the continued hostile work environment, harassment, and retaliation.

62. On July 24, 2023, Lanigan sent an email to Puron again informing her of the continued hostile work environment, harassment, and retaliation, reiterating the earlier allegations and specifically requesting that Puron investigate. A copy of the July 24, 2023, email is attached as **Exhibit B**.

9

63. On July 28, 2023, Puron responded to the July 24, 2023, email, essentially stating that Defendants were not taking any further action. A copy of the July 28, 2023, email is attached as **Exhibit C**.

64. This time, Defendants did no investigation into Lanigan's complaint.

65. Instead, the Defendants continued to allow Dreyer to harass Lanigan, as well as other employees.

66. The Defendants did nothing to protect Lanigan and upon information and belief, did nothing meaningful about his complaint.

67. On August 2, 2023, Defendants terminated Lanigan's employment.

### COUNT I
### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### 42 U.S.C. § 2000E ET SEQ. (1964)
### (Against All Defendants)

68. Plaintiff incorporates and re-alleges paragraphs 1 thorough 67 above as if fully set forth herein.

69. At all relevant times, Defendants have been, and continue to be an employer within the meaning of Title VII.

70. At all relevant times, the Defendants were Lanigan's joint employer within the meaning of Title VII.

71. Defendants intentionally and directly discriminated against Plaintiff on the basis of his sex in violation of Title VII.

72. Defendants subjected Plaintiff to a hostile work environment.

73. Plaintiff was subject to unwelcome sexual harassment.

74. The harassment was based on Plaintiff's sex.

10

75. The harassment Plaintiff experienced was sufficiently severe or pervasive to alter the terms and conditions of his employment and create an abusive working environment.

76. A basis exists for holding Defendants liable for the hostile work environment Plaintiff was subjected to.

77. Defendants treated Plaintiff differently from other employees based upon his sex in violation of Title VII.

78. Defendants discharged Plaintiff from his employment with Defendants because of his sex in violation of Title VII.

79. As a proximate result of Defendants' discrimination, Plaintiff was terminated from his employment, deprived of the opportunity to earn wages, suffered an adverse employment action, and was deprived of the opportunity to earn employment benefits.

WHEREFORE, Plaintiff, JOSEPH LANIGAN, demands judgment against Defendants for back pay, front pay, employment benefits, and other compensation lost to him as a result of Defendants' discrimination, compensatory damages, punitive damages, reasonable attorney's fees, expert witness fees, expenses, all other costs of this action, prejudgment interest, and any such other relief that this Court deems just and appropriate.

**COUNT II**
**VIOLATION OF FLORIDA CIVIL RIGHTS ACT OF 1992**
**FLA. STAT. 760.01 – 760.11**
**(Against All Defendants)**

80. Plaintiff incorporates and re-alleges paragraphs 1 thorough 67 above as if fully set forth herein.

81. At all relevant times, Defendants were Lanigan's joint employer within the meaning of the FCRA, *Fla. Stat. § 760.02.*

82. At all relevant times, Defendants have been, and continue to be an employer within the meaning of the FCRA, *Fla. Stat. § 760.02.*

83. At all relevant times, Defendants employs 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

84. According to *Fla. Stat.* 760.10(1), "It is an unlawful employment practice for an employer: (a) To discharge or to fail or refuse to hire any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, pregnancy, national origin, age, handicap, or marital status; (b) To limit, segregate, or classify employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities, or adversely affect any individual's status as an employee, because of such individual's race, color, religion, sex, pregnancy, national origin, age, handicap, or marital status." *Id.* (emphasis added).

85. Defendants intentionally and directly discriminated against Lanigan on the basis of his sex in violation of the FCRA.

86. Defendants subjected Plaintiff to a hostile work environment.

87. Plaintiff was subject to unwelcome sexual harassment.

88. The harassment was based on Plaintiff's sex.

89. The harassment Plaintiff experienced was sufficiently severe or pervasive to alter the terms and conditions of his employment and create an abusive working environment.

90. A basis exists for holding Defendants liable for the hostile work environment Plaintiff was subjected to.

12

91.     Defendants treated Plaintiff differently from other employees based upon his sex in violation of the FCRA.

92.     Defendants discharged Plaintiff from his employment with Defendants because of his sex in violation of the FCRA.

93.     As a proximate result of Defendants' discrimination, Plaintiff was terminated from his employment, deprived of the opportunity to earn wages, suffered an adverse employment action, and was deprived of the opportunity to earn employment benefits.

WHEREFORE, Plaintiff, JOSEPH LANIGAN, demands judgment against Defendants for back pay, front pay, employment benefits, and other compensation lost to him because of Defendants' discrimination, compensatory damages, punitive damages, reasonable attorney's fees, expert witness fees, expenses, all other costs of this action, prejudgment interest, and any such other relief that this Court deems just and appropriate.

**COUNT III**
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**
**42 U.S.C. § 2000E ET SEQ. (1964)**
**-Retaliation-**
**(Against All Defendants)**

94.     Plaintiff incorporates and re-alleges paragraphs 1 through 67 above as if fully set forth herein.

95.     At all relevant times, Defendant have been, and continue to be employers within the meaning of Title VII.

96.     Defendants intentionally and directly retaliated against Plaintiff for making a complaint about being subjected to a hostile work environment in violation of Title VII.

97.     Defendants discharged Plaintiff from his employment with Defendants because of

13

his protected activity.

98.    There is a causal connection between Plaintiff's protected activity and his termination insofar as among other things, there is close temporal proximity between the protected activity and his termination.

99.    As a proximate result of Defendants' conduct, Plaintiff suffered damages, including, among other things,  loss of income and emotional distress.

WHEREFORE, Plaintiff, JOSEPH LANIGAN demands judgment against Defendants for back pay, front pay, employment benefits, and other compensation lost to him because of Defendants' discrimination, compensatory damages, punitive damages, reasonable attorney's fees, expert witness fees, expenses, all other costs of this action, prejudgment interest, and any such other relief that this Court deems just and appropriate.

<u>**COUNT IV**</u>
**VIOLATION OF FLORIDA CIVIL RIGHTS ACT OF 1992**
**FLA. STAT. 760.01 – 760.11**
**-Retaliation-**
**(Against All Defendants)**

100.    Plaintiff incorporates and re-alleges paragraphs 1 through 67 above as if fully set forth herein.

101.    At all relevant times, Defendant have been, and continue to be employers within the meaning of the FCRA.

102.    Defendants intentionally and directly retaliated against Plaintiff for making a complaint about being subjected to a hostile work environment in violation of the FCRA.

103.    Defendants discharged Plaintiff from his employment with Defendants because of his protected activity.

104. There is a causal connection between Plaintiff's protected activity and his termination insofar as among other things, there is close temporal proximity between the protected activity and his termination.

105. As a proximate result of Defendants' conduct, Plaintiff suffered damages, including, among other things, loss of income and emotional distress.

WHEREFORE, Plaintiff, JOSEPH LANIGAN demands judgment against Defendants for back pay, front pay, employment benefits, and other compensation lost to him because of Defendants' discrimination, compensatory damages, punitive damages, reasonable attorney's fees, expert witness fees, expenses, all other costs of this action, prejudgment interest, and any such other relief that this Court deems just and appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury on all counts and issues so triable.

By: /s/*Michael L. Elkins*
Michael L. Elkins, Esq.
Florida Bar No. 523781
melkins@mlelawfirm.com
**MLE LAW**
1212 Northeast 16th Terrace
Fort Lauderdale, FL 33304
Telephone: 954.401.2608
*Co-Counsel for Plaintiff*

By: /s/*Joshua M. Entin*
Joshua M. Entin, Esq.
Florida Bar No. 0493724
josh@entinlaw.com
**ENTIN LAW GROUP,P.A.**
1213 SE 3rd Ave.
Fort Lauderdale, Florida 33301
Tel: 954.761.7201
*Co-Counsel for Plaintiff*

15